[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO DISMISS OF DEFENDANT STAUBER CHEMICAL INC. FOR LACK OF PERSONAL JURISDICTION
The plaintiffs, David and Marie Goldstein of Westport, Connecticut, originally brought this products liability/loss of consortium action by a complaint dated January 31, 1996. In their original complaint, the plaintiffs alleged that in October of CT Page 10817 1993, David Goldstein sustained certain serious physical injuries when he ingested a nutritional supplement known as PB 8, and that as a result of those injuries, he and his wife, Marie Goldstein, suffered several additional injuries and losses. Named as defendants in the original complaint were Nutrition Now, Inc. ("Nutrition Now"), a Delaware corporation with its principal place of business in Vancouver, Washington, American Type Culture Collection, Inc., a Washington, D.C. corporation with its principal place of business in Rockville, Maryland, and Food For Thought Natural Foods Market, Inc. ("Food For Thought"), a Connecticut corporation with its principal place of business in Westport, Connecticut. The plaintiffs alleged, inter alia: that Nutrition Now designed, prepared, assembled, tested, packaged, labeled, advertised, marketed and sold the PB 8 capsules that injured Mr. Goldstein.
Thereafter, Food For Thought filed a so-called "apportionment complaint," under the purported authority of Public Act 95-111 and General Statutes § 52-5720, against several additional "apportionment defendants," all of which had allegedly participated or sold and supplied ingredients used in the manufacture of PB 8. The new defendants were Cappseals, Inc., a Washington corporation with its sole place of business in Vancouver, Washington, which allegedly put the ingredients for PB 8 into capsules and packaged the capsules in sealed containers for retail sale, Forage Research, Inc. d/b/a Star Labs, Inc. ("Forage Research"),[1] a Missouri corporation with its principal place of business in Clarksdale, Missouri, which allegedly sold a bacterial product known as ProBiotic Supplement that was used as a component of PB 8, and Stauber Chemical, Inc. ("Stauber")[2] a California corporation with its principal place of business in Brea, California, which allegedly sold certain other bacterial products that were also used as components of PB 8.
The plaintiffs then pled over against the apportionment defendants, bringing direct claims for damages against each of them by an Amended Complaint dated August 27, 1997. Thereafter, Stauber filed a third-party complaint against Test Labs, Inc. d/b/a Brewster Foods ("Brewster Foods" or "Brewster"), a California corporation with its principal place of business in Reseda, California, claiming that Brewster had supplied the PB 8 components it had sold to Nutrition Now. Nutrition Now then followed Stauber's lead by filing a cross-claim, based on similar allegations, against Brewster Foods. Brewster Foods then filed a CT Page 10818 fourth-party complaint against Wellington Foods, Inc. ("Wellington"), a California corporation with its principal place of business in Long Beach, California, claiming that Wellington had been the source of the product it had supplied to Nutrition Now. Finally, Stauber amended its third-party complaint against Brewster to add its own separate claim against Wellington based on the allegations of Brewster's fourth-party complaint.
The case is now before the Court for decision on motions to dismiss for lack of personal jurisdiction filed by defendant Stauber.[3]
 I. GENERAL PRINCIPLES
In order to assert personal jurisdiction over a foreign corporation, a court must determine that two conditions are met. First, there must be a jurisdictional statute that reaches the conduct of the defendant. Fuehrer v. Owens-Corning FiberglassCorp. , 673 F. Sup. 1150, 1153 (D.Conn. 1986). Second, even where a statute purports to grant jurisdiction, the exercise of that jurisdiction under the circumstances presented must not exceed constitutional due process limitations, which require that the defendant have "minimum contacts" with the state sufficient that it would reasonably anticipate being haled into court there. Id. at 1153.
When a motion to dismiss for lack of personal jurisdiction raises a factual question that cannot be decided on the face of the record, the burden of proof is on the plaintiffs to present evidence which will establish jurisdiction. Standard Tallow Corp.v. Jowdy, 190 Conn. 48, 54, 459 A.2d 503 (1983). To meet this burden, the plaintiffs must do more than merely rely on conclusory allegations in their complaint. Instead, they must make at least a prima facie showing of jurisdiction through their own affidavits or supporting materials. Feuhrer v. Owens CorningFiberglass Corp., supra, 673 F. Supp. at 1153. A decision to grant a motion to dismiss may appropriately be based upon uncontroverted affidavits or materials from the party seeking dismissal. Id.
II. JURISDICTION UNDER THE STATE LONG-ARM STATUTE
In Connecticut, jurisdiction over a foreign corporation must be predicated upon General Statutes § 33-929, which provides in part as follows: CT Page 10819
 (f) Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: . . . (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers [.]
To meet its burden of proving that this Court has statutory jurisdiction over Stauber, the plaintiffs have attempted to show that Stauber's challenged actions bring it within the scope of Section 33-929 (f)(2) and/or (f)(3).
 A. Alleged Repeated Solicitation of Business in Connecticut
To establish jurisdiction over an out-of-state corporation under Section 33-929 (f)(2), the plaintiffs must prove both that their "cause of action aris[es] . . . out of any business solicited in this state by mail or otherwise" and that "the [defendant] corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state." In Thomason v. Chemical Bank, 234 Conn. 281, 295-96,661 A.2d 595 (1995), the Connecticut Supreme Court discussed the first of these requirements as follows, as it then was set forth in the predecessor of the current subsection, General Statutes § 33-411 (c)(2)[4]:
 For purposes of § 33-411 (c)(2), a plaintiffs "cause of action aris[es] . . . out of business solicited in this state" if, at the time the defendant engaged in solicitation in Connecticut, it was reasonably foreseeable that, as a result of that solicitation, the defendant could be sued in Connecticut by a solicited person on a cause of action similar to that now being brought by the plaintiffs. CT Page 10820
 Pursuant to our interpretation of the statute, a plaintiff need not show that, because of the acts of solicitation, the defendant was on notice that it might be sued by the plaintiff himself or herself. A plaintiff similarly need not show that the defendant solicited his or her business in Connecticut. A plaintiff need only demonstrate that the defendant could reasonably have anticipated being haled into court here by some person who had been solicited in Connecticut and that the plaintiffs cause of action is not materially different from an action that might have resulted directly from that solicitation.
 This interpretation of the statute is consistent with both of the principles we have discussed. On the one hand, because the statute does not demand proof that a particular plaintiffs business was solicited in Connecticut, the statute does not require proof of a "causal connection" between the solicitation and the plaintiffs injuries. On the other hand, because the statute does demand proof that a particular plaintiffs cause of action is similar to a cause of action that could have been brought here by a person whose business the defendant did solicit, the statute is more restrictive than the federal constitutional test for general jurisdiction, under which this state could have elected to exercise jurisdiction over causes of action wholly unrelated to the defendant's conduct in this forum.
The plaintiffs advance two reasons why the defendant should be subject to this Court's jurisdiction under Section 33-929
(f)(2). The first is that from 1992 through 1994, Stauber placed an advertisement in an annual trade publication known as the O.P.D. Chemical Buyers Directory ("O.P.D. Directory"). By so doing, claim the plaintiffs, Stauber repeatedly solicited business in Connecticut from each of the more than 300 Connecticut persons or businesses who then subscribed to the O.P.D. Directory. Secondly, the plaintiffs argue that since the latter part of 1997, Stauber has advertised its products on the Internet by ordering a "booth" on the Internet website of Schnell Publishing Company, the publisher of the O.P.D. Directory. By making this foray into cyberspace, claim the plaintiffs, Stauber has intentionally marketed its products to potential customers throughout the country, and thus repeatedly solicited business from Internet users, wherever they reside. By so doing, the plaintiffs contend, Stauber has exposed itself to suit in Connecticut and every other forum where its Internet advertising CT Page 10821 has reached potential customers. See generally, Inset Systems.Inc. v. Instruction Set, Inc., 973 F. Sup. 161 (D.Conn. 1996) (where the district court ruled that Connecticut had long-arm jurisdiction over a Massachusetts corporation that had advertised its products on the Internet because by 1996, when the action was commenced, such advertising had become so readily and repeatedly accessible to Connecticut's over 10,000 Internet users as to constitute the repeated solicitation of business in Connecticut).
Defendant Stauber opposes these arguments for several reasons which this Court finds persuasive. First, as to its three annual listings in the O.P.D. Directory, which were produced for the Court's examination, it rightly notes that each was but an informational announcement as to the general nature of its business rather than a focused solicitation of business in a particular market, or for particular products or services. Thus, though each modest, quarter-page listing gave Stauber's name, its California address, fax and phone numbers, and a short, generic list of its principal products, none listed particular products or services currently for sale, quoted prices for any such products or services, identified sales agents or customer representatives through whom would-be customers could order products or services, or gave a "1-800 number" or e-mail address by which out-of-state customers could conveniently place such orders. In short, each listing was like a card on a Roll-a-dex, stating "just the facts" about defendant Stauber in barebones fashion. As such, the listings were hardly calculated to drum up substantial business in Connecticut or elsewhere, and were not of such a character as to put Stauber on notice that by causing them to be published, it might one day be sued in Connecticut by persons whose business was thereby solicited.
The latter conclusion is particularly well supported by the fact that all three of the subject listings appeared in a national trade directory rather than a regional or local publication. A company's placement of advertising in a regional or local publication is obviously designed to solicit business in that particular area. When a corporation solicits business in a geographically focused area, it must reasonably expect to be sued in the courts of that area in any dispute arising from or concerning the business so solicited. Where, by contrast, a company's advertising is not so placed or designed as to solicit business in a particular area, no comparable expectation of being sued in local courts can be said to arise. CT Page 10822
Even, moreover, if the three subject listings can fairly be described as solicitations of business in Connecticut, defendant Stauber convincingly argues that they were not "repeat[ed] solicit[ations]" of such business, as is required for the exercise of long-arm jurisdiction under Section 33-929 (fJ(2). On this score, the defendant's arguments are both legal and logical. First, it appropriately reminds this Court of our Supreme Court's decision in Lombard Brothers, Inc. v. General Asset ManagementCo., 190 Conn. 245, 257-58, 460 A.2d 481 (1983), where the Court held that a New York securities dealer could not lawfully be sued in Connecticut merely because it had published certain informational advertising about its business operations and activities in certain publications widely circulated in this state. The informational advertising there in question was as follows: two announcements, each published once in the New York Times and the Wall Street Journal, as to the defendant's addition of personnel to its professional staff; and several "tombstone advertisements" in each newspaper, reporting the issuance of securities as to which the defendant was a participating underwriter. Id. at 249 n. 1. Though the Lombard Brothers Court expressly acknowledged, as the defendant in that case conceded, that the newspapers in question had entered Connecticut and been read by Connecticut consumers, it held that "[s]uch advertisements, without more, cannot constitute repeated solicitations of business [in Connecticut]." Id. at 257. "Apart from these advertisements," the Court noted, "there is neither allegation nor evidence that the defendant ever expressly solicited business from the plaintiff . . . or from anyone else. This case is therefore factually distinguishable from genuine solicitation cases such as McFaddin v. National Executive Search.Inc., 354 F. Sup[p]. 1166, 1168-70 (D.Conn. 1973), upon which the plaintiff relies." Lombard Brothers. Inc. v. General AssetManagement Co., supra, 190 Conn. at 257.
In McFaddin, on which the instant plaintiffs also rely, the district court found that it had personal jurisdiction over an out-of-state defendant under the Connecticut long-arm statute because the defendant had placed six advertisements in the Sunday New York Times and the Wall Street Journal over a six-month period. Importantly, each such advertisement had listed the name of the defendant corporation's Greenwich, Connecticut franchisee. The McFaddin Court concluded that since the out-of-state advertiser had purposefully and repeatedly directed its advertising to potential Connecticut customers in the relevant time frame, it should reasonably have foreseen that it might be CT Page 10823 haled into a Connecticut court to defend any action that arose from business resulting from that advertising.
Not surprisingly, other courts applying Connecticut law have also distinguished, for the purposes of satisfying the repeated solicitation requirement of the Connecticut long-arm statute, between frequent, geographically focused advertising that specially targets Connecticut customers, like that deemed sufficient to confer jurisdiction in McFaddin and less frequent, more general advertising that lacks a particular Connecticut focus, like that deemed insufficient to confer such jurisdiction in Lombard Brothers. See, e.g., E-Data Corporation v. MicropatentCorp., 989 F. Sup. 173 (D.Conn. 1997) (holding that a foreign corporation's distribution of catalogs in thirty countries, relationships with 27 international partners, research requests from unnamed clients with no geographical location, e-mail address and "1-800" phone number, none of which were factually linked to Connecticut, fell short of the repeated solicitation of business in Connecticut that is necessary to establish personal jurisdiction under the Connecticut long-arm statute); Wylie v.Sapphire Beach Resort and Marina, Superior Court, Judicial District of Litchfield, Docket No. CV 95 0067304 S (August 4, 1995, Pickett, J., 15 Conn. L.Rptr. 188) (holding that the defendant's placement of three advertisements in The Hartford Courant over a one-year period did not constitute the repeated solicitation of business in Connecticut because, citing Thomason,
supra, 234 Conn. at 296, the defendant could not "reasonably have anticipated being haled into [Superior Court] by some person who had been solicited in Connecticut by one of th[o]se advertisements").
Applying the logic of these cases to the facts here presented, the Court must agree with the defendant that its three general listings in the O.P.D. Directory do not constitute repeated solicitations of business in Connecticut. The listings in question, if advertisements at all, were general and informational in nature. By their very design, they were not intended to lead directly to the placement of product orders. Their publication, moreover, though in an annual directory which most subscribers probably retained for at least one year to use as a reference, was certainly not frequent. Finally and most importantly, the listings were not geographically focused on Connecticut, for they did not appear in the local media and nothing in them — including the products they generically listed, the persons from whom or the places where those products CT Page 10824 could be ordered, or the means by which such orders could be placed or processed — was geared particularly to Connecticut consumers or the Connecticut market. Under these circumstances, defendant Stauber cannot reasonably be found, simply by publishing its three annual listings in the O.P.D. Directory, to have repeatedly solicited business in Connecticut, or thus to "have anticipated being haled into this court by some person who had been solicited in Connecticut by one of th[o]se [listings]."Wylie v. Sapphire Beach Resort and Marina, supra.
As for the plaintiffs' alternative claim that the defendant is now subject to this Court's jurisdiction due to its advertising of products on the Internet since late 1997, the defendant argues, and this Court agrees, that such advertising is irrelevant to the instant motions because it postdates the commencement of this action. Whether or not a court has jurisdiction over a party must logically be determined as of the moment when the party is haled into court. See. e.g.,Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560,569 (2d Cir.), cert. denied, 117 S.Ct. 508 (1996); Green v.Sha-Na-Na, 637 F. Sup. 591, 595 (D.Conn. 1986) ("It is well established that jurisdiction is to be determined by examining the conduct of the defendants as of the time of service of the complaint."); Connecticut Aircraft Corp. v. Smith, 574 F. Sup. 626,630 (D.Conn. 1983). Absent jurisdiction at that time, the case must be dismissed if it is seasonably challenged by a proper motion to dismiss under Practice Book § 10-30 (formerly § 142).
This case was commenced against defendant Stauber by the service of Food For Thought's apportionment complaint of June 21, 1996 and the Goldstein plaintiffs' Amended Complaint of August 27, 1996. Therefore, since all of Stauber's Internet advertising activity took place over one year later, this Court concludes that such activity can furnish no lawful basis upon which to establish this Court's jurisdiction under Section 33-929 (f)(2).
 B. Alleged Production, Manufacture or Distribution of Goods With the Reasonable Expectation That They Were to Be Used or Consumed In This State and They Were So Used or Consumed
To establish jurisdiction over an out-of-state corporation under Section 33-929 (f)(3), the plaintiffs must prove both that their "cause of action aris[es] . . . out of the production, manufacture or distribution of goods by such corporation with the CT Page 10825 reasonable expectation that such goods are to be used or consumed in this state" and that goods so produced, manufactured or distributed were actually "used or consumed [here], regardless of how or where they were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers[.]" The parties agree that here, as in a claim of jurisdiction based on the alleged repeated solicitation of business under Section 33-929 (f)(2), "the phrase "arising out of' in [Section 33-929 (f)] . . . does not require a causal connection between the defendant's forum directed activities and the plaintiffs' lawsuit." Thomason v. Chemical Bank, supra,234 Conn. at 295. Instead, to paraphrase the Thomason Court's holding under Section 33-929 (f)(2), and thereby adapt it the instant claim under Section 33-929 (f)(3), a plaintiffs "cause of action aris[es] . . . out of [the defendant's] production, manufacture or distribution of goods, with the reasonable expectation that such goods are to be used or consumed in this state," if
 at the time the defendant engaged in such [production, manufacture or distribution of goods] . . ., it was reasonably foreseeable that, as a result of [such production, manufacture or distribution] . . ., the defendant could be sued in Connecticut . . . on a cause of action similar to that now being brought by the plaintiffs.
 . . . [A] plaintiff need not show that, because of the acts of [production, manufacture or distribution of goods . . . with the reasonable expectation that such goods are to be used or consumed in this state,] the defendant was on notice that it might be sued by the plaintiff himself or herself. . . . A plaintiff need only demonstrate that the defendant could reasonably have anticipated being haled into court here by some person who had [used or consumed goods it produced, manufactured or distributed with the reasonable expectation that such goods would be used or consumed in Connecticut] . . . and that the plaintiffs cause of action is not materially different from an action that might have resulted directly from that [use or consumption].
Thomason v. Chemical Bank, supra, 234 Conn. at 296. (Emphasis in original.)
The plaintiffs do not claim, nor on this record could they, that defendant Stauber produced, manufactured or distributed any of the goods that allegedly harmed plaintiff David Goldstein with CT Page 10826 the expectation, reasonable or otherwise, that such goods would be used or consumed in Connecticut. Here, to the contrary, Stauber has presented uncontroverted evidence, in the form of two sworn affidavits from its President, Daniel J. Stauber, that it played no role at all in producing or manufacturing the goods in question, and that the only role it might have played in distributing them was not such as to give it notice as to how or where they would be used or consumed.
In particular, Mr. Stauber avers that Stauber filled Nutrition Now's order for a bacterial product known as lactobacillus acidophilus by ordering a quantity of that product from a third party, Brewster Foods of Reseda, California, and causing Brewster to ship it directly, on instructions from Nutrition Now, from California to Portland, Oregon. Plainly, nothing about the nature or location of this transaction, or about the manner in which it was conducted, gave Stauber any notice that the goods it sold and had delivered to Nutrition Now might one day be used or consumed in Connecticut.
On this score as well, Mr. Stauber avers that at no time relevant to this case did Stauber learn how Nutrition Now, one of its smaller customers, planned to use the goods in question. Thus, though it was generally aware that goods of this kind were raw materials used to manufacture food supplements,[5] it never learned that they would be used to make PB 8, the nutritional supplement that allegedly injured Mr. Goldstein, where the manufacturing of that product would take place, or where or how that product would be marketed and distributed once it was manufactured. Lacking such rudimentary knowledge about Nutrition Now's business, Stauber rightly claims that it had no basis for suspecting, much less reasonably expecting, that the goods it sold and had delivered to that small West Coast business would one day be used or consumed in Connecticut.
Even so, relying on Thomason, the plaintiffs claim that this Court has personal jurisdiction over Stauber under Section 33-929
(f)(3) because on several occasions in 1992 and 1993, it knowingly sold and caused others to deliver its products to the State of Connecticut. On those occasions, claim the plaintiffs, Stauber filled orders from a New Jersey company called Generichem for bacterial products of the types involved in this case[6] by purchasing those products, as it did for Nutrition Now, from Brewster Foods, and causing Brewster to ship them directly, on behalf of Generichem, to Naturemost of New England ("Naturemost") CT Page 10827 in Middletown, Connecticut. Claiming that these transactions involved the "distribution of goods . . . with the reasonable expectation that such goods [we]re to be used or consumed in [Connecticut]," within the meaning of Section 33-929 (f)(3), the plaintiffs argue that the defendant was thereby put on notice that it might one day be sued in Connecticut by a person who, as reasonably expected, used or consumed such goods here. They therefore contend, under Thomason, that this Court has long-arm jurisdiction over Stauber because Stauber "could reasonably have anticipated being haled into court here by some person who had [used or consumed goods it reasonably expected to be used or consumed in Connecticut] . . . and that the plaintiffs cause of action is not materially different from an action that might have resulted directly from that [use or consumption]." Id. at 296.
Stauber disputes the foregoing analysis for two basic reasons: First, it claims that its transactions with Generichem did not involve the "distribution of goods, with the reasonableexpectation that such goods [we]re to be used or consumed in thisstate," as is required for the exercise of jurisdiction under Section 33-929 (f)(3). Second, it insists that even if those transactions could be found to satisfy the foregoing statutory requirement, they were so infrequent, indirect and insubstantial as not to put it on fair notice that it might be haled into court here by some person who claimed to have been banned by the use or consumption of its goods in the State of Connecticut.
 1. Defendant's Claimed Lack of Reasonable Expectation That Goods It Distributed to Connecticut Were to Be Used or Consumed Here
The defendant's first argument is made in two parts, both of which are tied to the fact that its transactions with Generichem involved the sale and delivery of raw materials rather than of finished products. Initially, it claims that such transactions did not involve the "distribution of goods, with the reasonable expectation that such goods [we]re to be used or consumed in this state" because the only way it could have anticipated that its goods would ever be used or consumed here was as components or ingredients of other products into which they would later be incorporated. On this score it argues: first, that finished goods are distinct and different from the raw materials with which they are made; second, that the use or consumption of a finished product therefore does not constitute the use or consumption of its components or ingredients; and, thus, third, that when"goods" are delivered to Connecticut with the reasonable anticipation CT Page 10828 that the only way in which they will be used or consumed here is as components or ingredients of other products into which they first must be incorporated, said delivery does not constitute the "distribution of goods, with the "reasonable expectation thatsuch goods are to be used or consumed in this state." Id.
In support of this argument, the defendant relies on Spahl v.Raymark Industries, No. CV95 50359 (Sep. 9, 1996)1996 Ct. Sup. 5395, where Judge Sferrazza made a similar analysis in dismissing claims against three Canadian suppliers of raw asbestos in an action to recover damages for injuries allegedly suffered while the plaintiffs were working with asbestos cloth made from the defendants' raw asbestos. In announcing his decision under General Statutes § 33-411 (c)(3), the identical predecessor of the statutory subsection here at issue, Judge Sferrazza reasoned as follows:
 Section 33-411 (c)(3) requires, before personal jurisdiction obtains, a reasonable expectation that "such goods" will be used or consumed in Connecticut and that "such goods" are actually used or consumed in the state. The "goods" which lies at the base of the cause of action in this case is asbestos cloth not raw asbestos ore. While mining companies might reasonably anticipate that the ore they extract will eventually be converted to other intermediate and finished products by others and that the transmogrified results could reach Connecticut, that expectation is not the one required by our long-arm statute. Rather, § 33-411 (c)(3) extends jurisdiction only to foreign companies who reasonably expect that the product they create will be used or consumed in Connecticut directly. An ingredient or component differs from the finished product into which the ingredient or component is placed.
 The plaintiffs' position was rejected in nearly identical circumstances by the U.S. District Court for Connecticut in two cases brought by other employees of American Optical against these defendants. In Szela v. Uniroyal, Civil Action No. H89-604 (April 19, 1991) and LeFleche v. Uniroyal,
Civil Action No. H89-756 (April 19, 1991), Judge Nevas held that there was "an insufficient factual basis to sustain jurisdiction under § 33-411 (c)(3)" over suppliers of raw asbestos fiber which ultimately became the cloth used by American Optical. CT Page 10829
 Under the plaintiffs' expansive interpretation of "goods" as applying to ingredients as well as finished products, no foreign corporation would fall outside of the scope of the long-arm statute. This interpretation would render the restrictive clauses of § 33-411 (c)(3) meaningless because any producer of raw material in the world would be subject to suit in Connecticut by virtue of having sold the raw material to others who could reasonably sell the finished products in Connecticut. Conceivably, a Bolivian tin mining company would be subject to suit in Connecticut because the tin supplied to a company in Taiwan was used to make a part of a toy manufactured in Mexico which was sold by a distributor in Illinois to a retail store in Connecticut which toy caused injury to a Connecticut resident because of the hardness of the tin part.
 The court holds that no personal jurisdiction obtained under our long-arm statute over foreign corporations whose only contact with Connecticut with respect to the cause of action was to supply raw material which was part of another product made by others which eventually was sold in Connecticut. The motions to dismiss are granted.
Id.
According to the defendant, the Spahl decision must be read to hold that a foreign corporation can never be haled into court in Connecticut based solely on its production, manufacture or distribution of goods, when the only way in which it is expected that such goods will be used or consumed in Connecticut is as parts or ingredients of another product. Such a reading, however, is fundamentally inconsistent with both the logic by which Judge Sferrazza explained his ruling and, not accidentally, the logic of our Supreme Court's decision in Thomason.
By observing, in particular, that the statute does not extend the Court's jurisdiction to those who merely "anticipate that the [products they produce, manufacture or distribute] will eventually be converted to other intermediate and finished products by others and that the transmogrified results could reach Connecticut[,]" Judge Sferrazza offered a narrower, more functional rationale for his ruling than that contended for by the defendant. His words suggest, as logic dictates, that when a defendant's goods are so incorporated into another product as to "convert" them into something new and different — changing CT Page 10830 their essential functions or characteristics, and thus "transmogrif[ying]" them — use or consumption of the new and different product cannot constitute use or consumption of the goods used to make the product, for such goods no longer exist, in form or in function. If this is true, then mere anticipation that such a new and different product will be used or consumed in Connecticut cannot give rise to a reasonable expectation that the goods used to make that product will thereby be used or consumed here.
By necessary implication, however, a similar conclusion cannot be reached when a defendant's goods are so incorporated into another product as not to lose their essential functions or characteristics. Many goods are used as components or ingredients of other products without being changed in any material way. Some are used exclusively as components or ingredients of other products, while others are used interchangeably, either as parts of other products or as separate products, in and of themselves. In either case, such goods, by their nature or design, retain their original form and functions both before and after they are incorporated into the products made from them. That is, if they work in a particular way before they are incorporated into the other products, they will continue to work in that same way after they have been so incorporated. By the same token, if they are in a defective condition, unreasonably dangerous to their ordinary user or consumer as they are originally constructed or configured, they will remain in that same condition when used as components or ingredients of other products. Plainly, no meaningful distinction can be made between the "direct" use or consumption of any such goods, before they are incorporated into other products, and their "indirect" use or consumption, after incorporation has taken place. Hence, whenever it is reasonably anticipated that a product into which such goods have been incorporated will be used or consumed in Connecticut, it must also be reasonably expected that such goods, as the unchanged components or ingredients of that product, will thereby be used or consumed here as well.
Against this background, this Court does not read Judge Sferrazza's decision or the statute it interprets to prohibit this Court from exercising personal jurisdiction over a foreign corporation when the only way the corporation expects its goods to be used or consumed in Connecticut is as parts of other products. Instead, it reads the decision and the statute to require any plaintiff who wishes to establish this Court's CT Page 10831 jurisdiction on that basis to present evidence, as part of its prima facie showing of jurisdictional facts, that when the defendant distributed its goods to Connecticut, it reasonably anticipated that the essential functions and characteristics of those goods would remain unchanged even after they were incorporated into the other products as parts of which they would be used or consumed. Otherwise stated in the words of the modern product liability doctrine, the plaintiff must make a prima facie
showing that the defendant reasonably expected the goods it distributed to Connecticut to be used or consumed here, either separately or as parts of other products, in substantially the same condition as they were when it first distributed them.
Such a rule, as previously noted, is consistent with our Supreme Court's decision in Thomason, on which the plaintiffs rely. There, to reiterate, the Court held that a plaintiffs "cause of action aris[es] . . . out of [the defendant's] production, manufacture or distribution of goods, with the reasonable expectation that such goods are to be used or consumed in this state," if
 at the time the defendant engaged in such [production, manufacture or distribution of goods] . . ., it was reasonably foreseeable that, as a result of [such production, manufacture or distribution] . . ., the defendant could be sued in Connecticut . . . on a cause of action similar to that now being brought by the plaintiffs.
Id. at 296. (Emphasis added.) The present cause of action sounds in products liability. Thus, to bring the defendant within this Court's jurisdiction under Thomason, the plaintiffs must establish that when the defendant conducted its dealings with Generichem, it could reasonably foresee that as a result of those dealings it could be sued in Connecticut on a products liability claim.
A products liability claim in Connecticut has the following elements: (1) that the defendant was a product seller, within the meaning of the Connecticut Product Liability Act; (2) that the item which caused him harm was in fact the defendant's "product" within the meaning of the Act; (3) that the product, when it harmed him, was in a defective condition, unreasonably dangerous to its ordinary user or consumer; and (4) that the product was expected to and did reach its ultimate user or consumer in substantially the same condition as that in which it was sold, CT Page 10832 leased or bailed by the defendant. Bobryk v. Lincoln Amusements,Inc., No. CV95-05470845 (Jan. 5, 1996) 1996 Ct. Sup. 184, 188. In light of these essential elements, a defendant that produces, manufactures or distributes goods is subject to this Court's jurisdiction under Section 33-929 (f)(3) if, in so doing, it can reasonably foresee that those goods will be used or consumed in Connecticut in substantially the same condition as that in which the defendant first sold, leased or bailed them. It does not matter if the defendant's goods are incorporated into another product before they are used or consumed in Connecticut as long as their condition, when used or consumed here, is expected to be substantially similar to that in which the defendant first placed them into the stream of commerce.
In this case, the plaintiffs have alleged that defendant Stauber's products, when used as ingredients of Nutrition Now's finished product that allegedly injured plaintiff David Goldstein, reached this State in substantially the same condition as they were when Stauber first sold and delivered them to Nutrition Now. Stauber, more significantly, has made the same allegation in its amended third-party complaint against Brewster Foods and Wellington Foods. There is thus a basis on this record for inferring that when bacterial products like those sold by Stauber to Generichem are used, as intended, to make food supplements, they are packaged as delivered, without changing their essential functions or characteristics, and sold as such to the consuming public. The Court concludes, on this basis, that the plaintiffs have made a prima facie showing that Stauber distributed its raw materials to Connecticut with the reasonable expectation that such goods were to be used or consumed here in substantially the same condition as they were when Stauber had them delivered.
The defendant's second reason for claiming that its prior business dealings with Generichem do not bring it within this Court's jurisdiction under Section 33-929 (f)(3) is that in conducting those dealings, it never learned how Generichem, Naturemost of New England, or any of their subsequent distributees would later use those raw materials, or where any finished product made from such materials would later be marketed. Thus, though it concededly caused goods ordered from it by Generichem to be shipped in Connecticut, Stauber insists that it did not do so with any reasonable expectation that such goods would be used or consumed here. CT Page 10833
On this record, however, there is ample basis for concluding that when Stauber filled orders from Generichem by purchasing raw materials from Brewster and causing Brewster to ship them to Connecticut, Stauber reasonably expected that products made from those materials would be used or consumed here. First, Stauber admittedly knew that all of the materials it bought from Brewster for Generichem were shipped not to Generichem's headquarters in Totowa, New Jersey but to Generichem's client, Naturemost of New England, in Middletown, Connecticut. It had this knowledge because whenever Generichem ordered such raw materials, it specifically instructed Stauber to ship them directly to Naturemost, and Stauber complied by so instructing Brewster. Stauber thus knowingly played a key role in causing its goods to be distributed to Connecticut.
Second, though Stauber may never have learned precisely how its raw materials would be used by Generichem, Naturemost or any subsequent distributee of those materials, it knew a great deal about the materials themselves, and thus about the reasons Generichem had them shipped directly to Connecticut. It knew, in particular, that the materials in question were raw materials commonly used to make food supplements. More importantly, it knew that such materials were "perishable and [had to be] shipped as directly as possible in order to maintain their potency." Affidavit of Daniel Stauber (2/15/99), ¶ 26.
The implication arising from this knowledge, which Generichem's President, Terrance W. Connolly, confirms to be true, is that when Stauber caused Brewster to ship its goods to Naturemost of New England in Connecticut, it did so knowing of the high probability that they would be used or consumed here. As perishable goods, Stauber knew that they had to be used as soon as possible after they were delivered. To ensure that this would happen, Stauber cooperated with Generichem by causing them to be shipped "as directly as possible" to the place they would be used. The selection of Middletown, Connecticut as their point of delivery was therefore not arbitrary. Instead, it obviously resulted from Generichem's determination, the significance of which could not have been lost on Stauber, that that was the place where the goods would best and most appropriately be used.
It is true, of course, that upon using Stauber's raw materials to make food supplements or other products, Naturemost may have marketed or distributed those finished products beyond the borders of Connecticut. In view of their perishable nature, CT Page 10834 however, they almost certainly did not go far. Moreover, both the name of the party to whom they were delivered and its location — Naturemost of New England of Middletown, Connecticut — strongly suggest that wherever else they might have been marketed, they were surely marketed in Connecticut. In sum, the Court concludes that when Stauber did business with Generichem, causing its goods to be sent to Generichem's customer, Naturemost of New England, in Connecticut, it did so with the reasonable expectation that those goods would be used or consumed in Connecticut.
 2. Defendant's Claimed Lack of Fair Notice That It Might Be Haled Into Court In Connecticut
Stauber's alternative basis for insisting that this Court cannot exercise jurisdiction over it under Section 33-929 (f)(3) is, to reiterate, that even if it can be found to have distributed goods to Connecticut with the reasonable expectation that such goods were to be used or consumed here, the transactions by which it did so were too infrequent, indirect and insubstantial to give it fair notice that as a result of those transactions it might one day be haled into court here. For the following reasons, the Court agrees, and therefore finds that the plaintiffs have failed to meet their burden of establishing jurisdiction on the facts here presented.
The twelve transactions by which Stauber distributed its goods to Connecticut, five in 1992 and seven in 1993, have already been described in some detail. Each transaction, as previously noted, was between the defendant, a California corporation not licensed to do business in Connecticut, and Generichem, a New Jersey corporation that distributes food ingredients and raw materials throughout the eastern United States. On each occasion, Generichem contacted Stauber from its principal place of business in Totowa, New Jersey with an order for specific products and instructions as to where they were to be delivered. Stauber filled each order, as previously noted, by ordering the products from Brewster Foods of Reseda, California and informing Brewster where Generichem wanted to have them shipped, which was always to Naturemost of New England in Middletown, Connecticut. In all, Stauber billed Generichem a total of $10,235.99 for the twelve transactions. Those sales represented less than one-half of one percent of Stauber's $25 million in gross sales during the two-year period in which they were made. CT Page 10835
Seen for what they truly were, the above-described transactions neither constituted nor resulted from any commercial activities by Stauber that were purposefully directed to the State of Connecticut. Stauber, to reiterate, has never been licensed to do business in Connecticut or sought to do any business here notwithstanding its lack of a license. Accordingly, as its President has averred, it has never had an office or employees here, it has never solicited business or published advertising here, it has never had a sales force or even a telephone number here, it has never had an agent for service of process here, it has never owned, leased or possessed real or personal property here, and apart from its transactions with Generichem, it has never shipped or arranged for the shipping of any of its products here. In short, it has done nothing whatsoever to drum up business in Connecticut, and could hardly have imagined being haled into court here to defend itself in a lawsuit.
As for the twelve transactions in question, moreover, Stauber neither initiated them nor controlled them. Instead, they were initiated and controlled by Generichem, which alone determined, without input from Stauber, that the goods it ordered should be shipped to Connecticut. By passing on Generichem's shipping instructions to Brewster, Stauber played a secondary or incidental role in causing the goods it ordered to be distributed to this state.
In conclusion, Stauber's only contacts with the State of Connecticut resulted exclusively from transactions initiated by others which Stauber did not solicit, direct or control. The transactions were infrequent in number and insubstantial in volume. Resulting, as they did, from accommodations to its New Jersey customer rather than from its own efforts to develop a Connecticut market for its products or clientele, they were simply insufficient to put Stauber on notice that it might one day be haled into a Connecticut court to defend a civil lawsuit. The Court thus agrees with the defendant that all claims now pending against it must be dismissed for failure to satisfy the minimum jurisdictional requirements of Section 33-929 (f)(2) or (f)(3).
 III. JURISDICTION UNDER CONSTITUTIONAL DUE PROCESS STANDARDS
Defendant Stauber's fall-back argument is that even if the CT Page 10836 plaintiffs have established statutory jurisdiction under General Statutes § 33-929 (f), which they have not, the record does not support a finding that it has sufficient "minimum contacts" with Connecticut to satisfy due process standards. For the reasons that follow, the Court agrees that such minimum contacts have not been established, and thus concludes on this basis as well that all claims against Stauber must be dismissed for lack of personal jurisdiction.
"A state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist "minimum contacts' between the defendant and the forum state." World-WideVolkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559,62 L.Ed.2d 490 (1980). The contacts must be such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington,326 U.S. 310, 326, 66 S.Ct. 154, 90 L.Ed.2d 95 (1945).
"The twin touchstones of due process analysis under the minimum contacts doctrine are foreseeability and fairness."United States Trust Co. v. Bohart, 197 Conn. 34, 41,495 A.2d 1034 (1985). "The specific facts of each case necessarily determine the outcome of a minimum contacts analysis." Id. at 42.
"It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v.Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528
(1985). However, "jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. . . . So long as a commercial actor's efforts are "purposefully directed' toward residents of another State, [our Supreme Court has] . . . consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." Id. at 476.
"Either `specific' jurisdiction or `general' jurisdiction can satisfy the constitutional requirement of sufficient minimum contacts between the defendant and the forum." Thomason v.Chemical Bank, supra, 234 Conn. at 288. A State can exercise "specific jurisdiction" over a defendant when the suit in question arises out of or relates to the defendant's contacts with the forum. Helicopteros Nacionales de Columbia, S.A. v.Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A CT Page 10837 State can exercise "general jurisdiction" over a defendant when, though the suit in question does not arise out of or relate to the defendant's contacts with the forum, such contacts are "continuous and systematic." Id. at 414, 416.
In this case, there is plainly no basis for exercising specific jurisdiction over defendant Stauber, since this case does not arise out of or in any way relate to any of the defendant's very limited contacts with this state. If the defendant's goods were used at all to make PB 8, the nutritional supplement that allegedly injured plaintiff David Goldstein, they were ordered from Stauber by Nutrition Now and purchased by Stauber from Brewster Foods in California, shipped by Brewster, on behalf of Stauber, from California to Portland, Oregon, and used by Nutrition Now, either in Portland or at some other location unknown to Stauber, to make the product in question. No alleged activity by defendant Stauber, upon which its liability in this case is sought to be established, is claimed to have involved or to have been related to any of its contacts with the State of Connecticut.
The defendant's contacts with Connecticut, moreover, have not been so "continuous and systematic" as to give this Court general jurisdiction over it under the prevailing constitutional test. To the contrary, for the reasons set forth in Part II.B.2 of this Memorandum of Decision, supra, the defendant's only contacts with this state can best be described as infrequent, indirect and insubstantial. The defendant, to reiterate, has never been licensed to do business in this state and has never "purposefully directed" its commercial activities to this state or its consumers. It therefore cannot be haled before this Court to defend the instant lawsuit without violating its federal constitutional right not to be deprived of its property without due process of law. For that reason as well as the plaintiffs' failure to satisfy the minimum requirements of the Connecticut long-arm statute, the defendant's motions to dismiss for lack of personal jurisdiction must be granted.
It is so ordered this 9th day of August, 1999.
Michael R. Sheldon, J.